May it please the Court, my name is Stacey Tolchin and I, with Mark Vanderhout, represent Petitioner Shanglin Quinn, who is present in the Court today. I'd like to reserve three minutes of my time for rebuttal. This case is controlled by the Court's decision in quite a different case than Chau. Is it not? I mean, how and why should we overturn a overt credibility finding when a judge cites cogent reasons for dublility, including Chin's purported escape from the ship and the letter that could not fit in the envelope? Your Honor, a couple of responses to that. First, the majority of the decision is based on pure speculation and conjecture. The issues regarding Why was it speculation that when he said the commissar was on the ship and was going to arrest him and then the commissar lets him take all of his papers, all his personal facts, to go out and make a phone call because he's feeling crazy and let him off the ship? Your Honor, first, we don't know the details of the ship and what was actually the architecture of the ship and as far as what was seen. So it's certainly possible that he may have been able to take things and leave. Now, as Petitioner Quinn explained in his application for the kind-heartedness union, he wanted China to model its civil rights policies after the United States. He had great motives and purported motives and but what we have to find on appeal, did the judge have substantial reason to find him incredible? Can you explain the envelope? Yes, Your Honor. So the issue was that Petitioner testified that in August of 1999, he received an envelope, a letter from his wife and enclosed in that envelope was a summons. The immigration judge alone examined the summons and stated that he did not believe the folds in the envelope matched the, I'm sorry, the folds in the summons matched the envelope. Now, there was no government forensic expert that was offered. There was nothing offered by the government at all. In fact, this was purely the judge who was questioning whether or not it was a valid summons and whether or not Petitioner's testimony explained how he received the summons. But more importantly, if you, there was three years that elapsed between when Petitioner Quinn received the summons and when it was presented to the immigration judge. And Petitioner Quinn explained that he received the summons and then put it into a book. And so certainly it's possible if the folds were changed when it was put into the book, that there may other be folds in there that are not readily visible to the naked eye. But since there was no forensic expert that was offered to really truly look at that document, it was solely based on the immigration judge examining it just as a layperson. Well, isn't that exactly what happened in the E.O.J. Simpson case? The gloves don't fit and you must acquit. It's not a question of the folds, it's a question of it didn't fit in the envelope. That could be told by a person who is a layperson. Well, but as Petitioner... Do you think if the jury based its decision on if the glove don't fit, it must acquit, that that was a reasonable decision? You better say yes. Or maybe I should add, I really think that's what caused the jury to do what it did. Never mind, go on. Your Honor, I do want to point out that a document can always fit into an envelope, it's always just an issue of how it's folded. And again, there may have been folds that were not visible to the naked eye that were not examined by the judge. And, you know, had there been an expert that was presented to question the authenticity of the summons, then that certainly would have been a different story, but that did not happen. Now, in addition, there was no other reason to believe that... Here's what I think about these folds and why it doesn't fit. And can you give me an explanation of the folds? The judge does address the folds at... Can't give you an exact... I know that he said that they had appeared that the folds were in thirds and that it didn't fit into the envelope, is what I believe the immigration judge stated. During the hearing. During the hearing, correct. And then did he ask for an explanation? He did, and Petitioner explained that when he received the summons in the letter, he then placed it into the book and that it was pressed in the book. And again, then three years elapsed before he gave the immigration judge the summons. But I'd also like to point out that there's no dispute that Petitioner was a crewman. He did clearly come on the ship that he testified about. He clearly came as an alien crewman and in fact was only entitled to an asylum with only hearing because he was an alien crewman. Let's talk about the ship, the subject that Judge Nelson brought up. He was on the ship and got off in Australia and that's how he got the summons. Then he started reading Falun Gong. The commissar found that, remonstrated with him, told him he shouldn't be reading Falun Gong, he should be reading the thoughts of the chairman or something else, and didn't let him get off the ship in Japan, the next port. Then he let him off the ship with his effects to make a phone call in America. Why isn't the IJ entitled to disbelieve that improbable chain of circumstances? Petitioner explained when he testified that he actually had developed a personal relationship with the commissar. And so in the beginning, he was hiding the materials on Falun Gong. The commissar then came to his room and found him reading the materials. And then more time elapsed. And again, at that point, Petitioner was having stomach problems and was taking some significant medication. And Petitioner testified that he then feigned a stomach illness and feigned dementia, essentially, and so was able to go off the ship. Now, it's certainly... He didn't go off the ship because he feigned dementia. He got off the ship because he was going to make a phone call to his family. He was lonesome. Well, correct, Your Honor. But he also was faking dementia at that time as well. I can try to find the... So he didn't let him off in Japan and he didn't let him off in California. And the only difference is they had a better personal relationship between the commissar who didn't let him off on a ship in Japan. And he was faking dementia and he wanted to talk to his wife on the telephone. And that was sufficient to change the commissar's view. And time had elapsed, all of those things. Yes, Your Honor. But... Okay. Are there two possible views to that chain of circumstance? Because if there's one reasonable view that it doesn't make sense, then there's substantial evidence for the I.J. to make the adverse credibility finding. And under Lee v. Ashcroft, you don't have to have more than one. Your Honor, but I don't believe that this issue goes to the heart of the asylum claim, as the claim hinges on the application for the kind-heartedness union and the letter that was sent to the Chinese government, and then the Chinese government sending the inquiry notice, and then petitioner's failure to appear because of the inquiry notice and the summons. And so his claim is not hinging on the existence of the political commissar on the boat. But it goes to the heart of the matter. He wanted to get out of China and Chinese dominion, right? Correct, Your Honor, but there's... Because of political reasons. Yes, Your Honor. But there's no indicia otherwise that any of the nine letters that petitioner's wife sent detailing the visits that she received from the Chinese government or the inquiry notice or the summons otherwise are not valid. The case is very similar to Zhao in that in Zhao, there were faxed warrants that were received. And in this case, these were the original documents, but the immigration judge concluded that since they were not properly authenticated, he would not give them weight. In addition, the judge stated that he would not give full weight to the nine letters that were submitted by petitioner's wife because she was not available for cross-examination. But in Zhao, the court is clear that unless there's evidence of forgery or unreliability in those letters, then the letters must be given full weight. I don't think there's any question that there's a great deal of speculation in the I.J.'s decision. But on the two points that we've been discussing, the envelope and getting off the ship, why do you think there's not substantial evidence to allow reasonable I.J. to disbelieve your man? I think on the envelope, Your Honor, there was not substantial evidence because I don't think the immigration judge was in a position to assess whether or not the document could fit. You would have us make a rule that that type of evidence requires some forensic expertise. Yes, Your Honor, because there, the immigration judge concluded that there were no other folds. And certainly, again, there may be folds that were not visible to the naked eye after three years. Now, what's wrong with the ship testimony? Regarding the ship testimony, it certainly is speculative, basically, for the immigration judge to conclude that the commissar would not have let Petitioner off the boat. Petitioner explained in detail. But he had let him off the boat in Japan. That's correct, Your Honor. But the change, there was a change in circumstances, which was the issue of the illness, the dementia, and wanting to call the family. But he let him off with all of his personal effects. Again, Your Honor, he, we know that he took them off. We don't know, he didn't actually testify in the manner of how he took them off the ship. Well, there was evidence that he took all of his personal effects when he left the ship, quotes, to make a phone call. He did, Your Honor. And he explained in his testimony that he was very worried about going back to China. And so he explained his motivation for taking them off, which was to protect himself. But since we don't know physically the layout of the ship, we certainly don't know whether it was not possible for him to take those items off. Why was it speculation on the part of the immigration judge, then, if we have in evidence the fact that, after all of this talk about the commissar going to put him in jail, that the commissar said, oh, you're not feeling well, you feel mentally unstable, I'm going to let you off the ship with all of your personal effects? Why wasn't that sufficient? I'm sorry, Your Honor? Why wasn't that sufficient for the immigration judge to conclude? Why was that speculation on the part of the immigration judge? Because it certainly was possible that the commissar had a change because, again, they had developed a friendship. And so it is possible that the commissar, while not letting him off in Japan, would then go ahead and let him off when they reach Sacramento. Your point is right. It's possible, but it's not compelling, substantial evidence. Your Honor, but again, I believe that this doesn't go to the heart of the claim. It's the fear of persecution rests on Petitioner's failure to attend the interview that was required by the inquiry notice that was first sent in, I believe. The question really is, is this improper speculation rather than is it a compelling evidence? If it's improper speculation, then we have to disregard it. What's your basis for saying that it's improper speculation, that a commissar would not have let this man off the ship when he told him he was sick and had to go make a call? Why do you say that's improper speculation? Because the judge is placing himself into the mind of the commissar to try to determine why the commissar would do one thing and not the other. It's very similar to what was said in Zhao where, and I believe in, I think it's in Jibril or Jay, the decisions where the court says we can't guess why officials do what they do. We need only to look at what the objective evidence is. And if the objective evidence is otherwise reliable and has no evidence of forgery or unreliability, then we must take that as true. So, for instance, certainly in Zhao, there was an issue regarding the issuance of a general arrest warrant where there was no specific reference to the Falun Gong. And I believe in Jibril there was an issue as to, I'm sorry, in the Singh case that's cited in the briefs, the immigration judge there did not believe that the Indian government would be going after people who were just minor political activists. And the court then again says that's speculation and conjecture as to why an official does what he does. Well, you know, your time is running. And since you're talking about the Zhao case, I was surprised that you cited it on the Kat claim. Because in Zhao, um, they found that it was more likely than not he would be persecuted, but they found him, the petitioner, ineligible for Kat protection because the expected treatment would not rise to the level of torture. It seems to me Zhao is not in your favor. Your Honor, I actually think that's correct. I did cite to the record in terms of what country conditions demonstrate in the use of torture. But certainly under the Zhao decision and the Zhang decision, the court does conclude that Kat... What were the country conditions in those cases? They're actually quite similar, Your Honor. In Zhao, the conditions that are considered are an amnesty report and a state department report. And the amnesty report in detail goes through the persecution of Falun Gong. It's the same report that's cited in this case. It's in page 187 of the record. In addition, Zhao cites the 2001 state department report, which is in 478 of the record here. So you're saying there is no difference? No, there's not much of a difference at all. There's a very substantial report from amnesty detailing the Falun Gong crackdown, and that's in both records. And that's the majority of what's cited. But how can you qualify? And let's say that the IJ was wrong in not making specific reference to the country reports on the Kat claim because the adverse credibility finding cannot eliminate his duty to review the country reports. But this man said he was not a member of Falun Gong, and he was sympathetic to Falun Gong. The same thing as Zhao. I was on the Zhao panel. The Zhao was carrying material for somebody on Falun Gong, but was not a member herself of Falun Gong, and she didn't get Kat treatment. Isn't that the same situation here? Your Honor, I do think in this case, Kat provides nothing more than withholding because as petitioner otherwise is eligible for withholding, I do believe that the Zhao case most likely would require a finding that he's not eligible for Kat in the same way that it would require a finding that if he's credible, he should be granted withholding and found eligible for asylum. I'd like to reserve the remaining time. I have one other question for you. When he took the luggage and all his possessions off the ship, is there testimony that the commissar was aware of that? I don't believe there is, Your Honor. The commissar just gave him permission to leave the ship? He was given permission to leave temporarily, yes, Your Honor. And he then took his possessions with him? Correct, Your Honor, but again, we don't know the means of how he was able to actually take them. There's no evidence that shows that anybody was aware that he took his luggage off the ship? Nothing. Okay, we'll reserve the remaining. Thank you. Good morning. May it please the Court. Russell Verbe, on behalf of Attorney General Michael McCasey. Obviously, we have an adverse credibility determination measured under the substantial evidence standard. Mr. Quinn claims that his troubles began when he sent the two letters, critical of the Chinese government, to a highly repressive regime. He initially denied having any fear of reprisal for sending the correspondence, but moments later, he said that he did have a little bit of fear. And it seemed odd to the immigration judge that Quinn supposedly sent these letters in response to the beating of his elderly neighbor, who endured that beating because she had practiced Falun Gong herself. Now, it's going to seem like a small and minor point, but it goes to the question of whether the petitioner actually did send the letters. In short, these letters were sent by a person to a type of regime that he knew firsthand how they respond to people who hold different views or who dissent from the party line. And yet he sent them with no fear. And if you add that lack of fear to the fact that the letters contained no information about the neighbor whose beating supposedly spurred the desire to send the letters, and that the letters didn't have any personal information with regard to the petitioner, nor did they even have any information about Falun Gong, it brought up some real doubts in the immigration judge's mind as to whether these documents were sent in the first place. Now, we also have, moving on to the freighter, the immigration judge had some doubts that a Chinese government official would be serving openly on board a Panamanian-flagged Korean skipper cargo vessel. What was the crew? The crew was partially Korean and partially Chinese. What partially? What is that? The number 16 crewman stands in my mind as the Chinese portion of the crew, I believe. I can't be 100% on that. Out of how many? That I'm not sure. But I think the thing that struck the immigration judge was that we have a Chinese government official operating openly in this, and apparently, according... Would it be unusual if there is a large Chinese crew on a vessel for them to designate somebody as a commissar, or, you know, as the one in charge of keeping political loyalty? Maybe as a... I don't know if they would do that. I mean, I could see maybe appointing a liaison as a cultural representative of, hey, look, we're the Korean... We're all speculating, aren't we? Yes, we are. Just like the ALJ. But the problem is, Your Honor... Or the IJ, I'm sorry. The burden was on this alien to explain the inconsistency sufficiently. Well, he said they did have somebody in charge of the Chinese people there, who he called a commissar. But who was somebody in charge of their political loyalties? Well, apparently, this person had so much power on board the vessel that they were supposedly able to order the physician to poison the petitioner. An unexplained... I don't know how this power gets to a person that they can tell the ship's doctor, who's under the command of the skipper of the vessel, that you should begin poisoning one of the people on board. Was he Chinese? The ship's doctor? It's not exactly clear who it was, Your Honor, what his nationality was. Also... Well, the IJ did say that Chen's testimony was utter nonsense. However, he did then specifically point to the envelope. He pointed to the implausibility of his testimony. And the fact that a purported summons from the Chinese police, you know, could not fit in this envelope. What do you do with the envelope testimony and posy counseling saying there should have been an expert called? Well, Your Honor, it's fairly well established that immigration judges are allowed to use their common sense, just as a juror would as a fact finder, to look at this envelope and look at the document. The document had fold lines on it that didn't possibly fit into the envelope provided. The immigration judge said on the record, explain that to me. It's at page 396 of the record, running through page 401. Explain why there are no folds that correspond to this particular envelope. Petitioner said, well, I placed it between to the pages of a book and pressed it. Well, common sense, as the immigration judge made pretty clear in his decision, would say then you would still be able to see secondary or earlier folds that you could trace that if you folded the document, they would actually fit into the envelope provided. That was absent in this case. The petitioner had the burden to explain the inconsistency and didn't do it. Also, the odd things with respect to the... Now, you may be more of an expert in folds than I am, but if you fold a document, put it in a book for three years and that's the way it stays folded, it necessarily retains all the old folds. You might be able to see some of the old fold lines. I think you generally would. You might not. I mean, I'm not an expert on it. You seem not to be. Maybe the immigration judge isn't an expert in folds either. Perhaps not. Maybe it's speculation. It is common sense. Well, it's common sense or speculation if you don't know how long folds are retained when you refold something. Your Honor, again, the judge is allowed to use his common sense. Well, I don't know where his common sense is. I would believe that there would be a secondary fold line that I should be able to see that doesn't exist. It's the alien's burden when he's confronted with an inconsistency to satisfy the immigration judge, and he failed in that regard. There may not be an inconsistency. It may just be the speculation of an immigration judge, in which case it's not enough. Your Honor, you and I are probably going to have to disagree on that. And I mean, we can call everything that the immigration judge says a speculation. Well, we might in this case. We might, but I don't think the record compels us to do that, Your Honor. Let me ask another question. My opponent seems to depend on the Chao case, and you didn't deal with it in your briefs. How would you distinguish it? Well, Chao, Your Honor, adverse credibility cases are fact-driven cases. Therefore, when you say that one alien is credible, it doesn't necessarily mean that any alien from the country or tells even a similar story is necessarily credible and entitled to asylum. Chao, with respect to legal holdings, really offers nothing new. A judge can't speculate. That's been around for a long time before Chao. A judge must give specific and cogent reasons. That's been around for a long time before Chao. A judge cannot call for corroborating documents from a foreign land that might be difficult for the alien to get. Those were the basic reasons why the immigration judge decision in Chao was rejected. Those rules have existed long before Chao. A lot of emphasis is put on Chao, but it really doesn't offer anything new. From a factual standpoint, as you admitted yourself in the outset of my opponent's argument, the facts don't even seem very similar. So I'm not exactly sure where Chao controls or where Chao offers anything completely and totally new to the analysis, except in this fact with respect to the cat claim, where a person who offers the same or less support for the following gang movement doesn't seem to be in jeopardy for torture. So I think that's where... The cat is not entitled to cat relief. Absolutely. All right, thank you. The other interesting inconsistency I think does come from the fact that this alien, whose relationship with the Chinese commissar appeared to be blossoming in some respect until he's found reading the following gang book prior to their arriving in Japan. From that point on, the relationship begins to deteriorate where Mr. Quinn is demoted, he is punished, he's sent out on a crane to scrape ice or paint or something along those lines during wintry weather, he begins to be poisoned, he's denied shore leave when the vessel reaches, he can't take liberty call in Japan. But then by the time we get to the United States, I have a hard time believing that that relationship has improved sufficient that the Chinese commissar is now going to trust the petitioner to go ashore and cross the brow with all his personal gear in tow. That was a huge inconsistency. Does it show that he was allowed to do it with his personal gear in tow? He offered no explanation as to how he spirited these things over the overboard. He just said he walked directly off the ship with all his possessions. If there was some sort of plan that he used to get off the ship with these things, he should have brought it forward, Your Honor. There's no evidence that the commissar was aware that he was taking his luggage off the ship. No direct evidence, no, Your Honor. But if he is going ashore, you know, posting on board, he has to explain how he got past anybody who was watching the vessel. He could have been asked that question if you thought that was suspicious. Could have said, how did you get off? Were there people there? Did anybody ask him? How did you get off the vessel? How did you get permission to leave the vessel? I pretended that I was out of my mind.  But did anyone ask him who observed him with the luggage? Did anyone say anything to him? Was the commissar there? The question perhaps didn't go that deep, Your Honor. Pardon? The question perhaps did not go that deep. I don't believe it did. But there is the completely unexplained inconsistency of how you're denied shore leave in Japan, but are granted permission to go ashore in, of all places, the United States of America. And the only explanation given was that I pretended to have been out of my mind. And that was, in the immigration judge's mind, completely nonsensical and didn't carry. I also wanted to make a telephone call. You also wanted to make a telephone call. So at the end of the day, the standard of review being substantial evidence, it's not enough for this court to say we could draw different conclusions. There has to be compelling reasons. There has to be an inescapable conclusion contrary to that found by the agency. And that simply doesn't exist here. Well, not inescapable. That's a little too much. Let's say compelling. You must be compelled. No reasonable fact finder could have agreed with the immigration judge. As compelling governmental interest is, it shouldn't be any problem. They shift, Your Honor. If we all know what speculation is, on the other hand, and we said that this is an improper finding because it's simply speculation, then, of course, we have no problem. If you were, Your Honor. All right. If there are no further questions, I'll conclude the government's presentation in this case. Thank you. First, I'd like to direct the court to the decision in, I think it's Gay v. Ashcroft, it's GE, 367 Fed 3rd, 1121. Is that cited in your briefs? Thank you. And it's at page 1125, where specifically the court addresses an issue of speculation and conjecture and states the majority of the IJ's findings rest on her speculation about what she imagined what Chinese authorities would or would not do under certain circumstances. And the court says, then, that this is pure speculation and conjecture and not permissible. Now, in addition, back to the folds again and the issue of speculation. Certainly, if a document comes in the mail folded, it's then opened and then it's pressed for three years and then refolded, it's certainly possible that these original lines would not be visible to the naked eye. Again, that speculation and conjecture that the immigration judge concluded that the lines were not there. I'd also like to address the issue of the commissar. Again, there was time that developed in between the time on the boat. And again, they did develop a personal relationship. And so it's pure speculation to think what the commissar would and would not have done. Where's the evidence that between Japan and the United States, the relationship developed between the commissar and Mr. Quinn and the relationship that developed was one of friendship rather than animosity? Now, the petitioner testifies that their relationship developed as friendship and that he spent more time with him. I don't have the citations to the record. But again, and I don't specifically have the amount of time that elapsed between Japan and the U.S., but clearly it was a good amount of time before that happened. And again, once again, there is no testimony as to whether or not the commissar knew that petitioner was taking these materials off the boat. Okay, I think that's all, Your Honors. Thank you very much. Thank you, counsel. Case just argued will be submitted.
judges: Nelson, Reinhardt, Bea